IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KIRK DICKSON,<br><br>Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD CO.,<br><br>Defendant. | **8:23-CV-334**<br><br>**MEMORANDUM AND ORDER ON DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Kirk Dickson (Dickson) is suing his former employer, defendant Union Pacific Railroad Co. (Union Pacific), under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*. Filing 22. The case is now before the Court on Union Pacific's Renewed Motion for Summary Judgment. Filing 103. Union Pacific seeks summary judgment on the grounds that Dickson cannot establish that he is a "qualified individual" under the ADA; that Union Pacific had a legitimate, non-pretextual, non-discriminatory reason to remove him from his position; and that Union Pacific's "direct threat" defense is established as a matter of law. Filing 104 at 6. For the reasons stated below, the Court grants Union Pacific's Renewed Motion for Summary Judgment based on the "direct threat" defense, which defeats Counts I and II of Dickson's First Amended Complaint. This case shall proceed only on Count III of Dickson's First Amended Complaint.

## I. INTRODUCTION

The facts set out here are undisputed unless specifically indicated otherwise. The facts set out here are drawn from the parties' statements.[1] However, the Court has sometimes quoted from

[1] The Court will cite Defendant's Reply to Plaintiff's Statement of Additional Material Facts in Opposition to Defendant's Renewed Motion for Summary Judgment (statement of facts) for undisputed facts. Filing 122. That statement of facts reflects a helpful consolidation of the other statements filed by parties in compliance with Local Rule 56.1. *E.g.*, Filing 105; Filing 116.

documents or testimony in the record rather than rely on the parties' statements that contain differing characterizations of what the documents or testimony say or mean for the case.

### A. Factual Background

Dickson resides in California and began working for Union Pacific in 1996. Filing 122 at 1–2 (¶¶ 1,4). Union Pacific is a railroad carrier headquartered in Omaha, Nebraska, engaged in interstate commerce. Filing 122 at 1 (¶ 2). Most recently and at the relevant times for this case, Dickson worked for Union Pacific as a front-end loader operator. Filing 122 at 2 (¶ 4); *see* Filing 106-2 (track laborer job description).

On April 6, 2019, Dickson had a stroke "while at home and off duty." Filing 22 at 7 (¶ 33); Filing 122 at 6 (¶ 18). He was "working out in the garage with weights" and "just passed out, fell to the floor." Filing 108-1 at 14 (Exhibit 1, Dickson Depo. 56:1–3); Filing 122 at 6 (¶ 18). He was taken to a hospital where he was diagnosed with having suffered from an ischemic stroke. Filing 108-1 at 44–45 (Exhibit 5); Filing 122 at 7–8 (¶ 22). Dickson's "acute ischemic stroke" caused "neurological deficits including left side numbness, weakness, ataxia, and neglect." Filing 122 at 7–8 (¶¶ 22–23).

While hospitalized, Dickson's wife notified Union Pacific and requested medical leave of absence on his behalf. Filing 108-1 at 15 (Exhibit 1, Dickson Depo. 58:21–59:6), 87 (Exhibit 9, Medical Comments History); Filing 122 at 9 (¶ 26). Union Pacific placed Dickson on medical leave of absence from April 8, 2019, to May 10, 2019. Filing 122 at 9 (¶ 27); *see* Filing 108-1 at 91–92 (Exhibit 10). Union Pacific also notified Dickson of the mandatory FFD review:

> In accordance with Union Pacific Railroad Medical Rules, you will require a Fitness-For-Duty (FFD) review prior to your return to work. This involves a review by Health & Medical Services of medical information related to your absence. Please provide the following information . . . .
>
> > Copy of the operation/surgery/procedure report.
> > Copy of the physician's dictated hospital discharge summary.

> Copy of Emergency Department records.
> Copy of diagnostic study reports including lab work, x-ray, CT scan, MRI, Ultrasound, etc.
> Copy of diagnostic study reports including lab work (cardiac enzymes), chest x-ray, EKG, echocardiogram, CT scan, MRI, cardiac stress testing, etc..
> Copy of physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition.
> Copy of physical therapy notes from your treating provider.
> Return to work release from your treating provider.
> List of any limitations/restrictions and their duration.

Filing 108-1 at 91 (emphasis omitted) (Exhibit 10).

On April 9, 2019, Dickson was discharged from the hospital to a rehabilitation facility. Filing 108-1 at 44–54 (Exhibit 5); Filing 122 at 8 (¶ 24). On April 16, 2019, Dickson was discharged from the rehabilitation facility to his home. Filing 108-1 at 74–79 (Exhibit 8); Filing 122 at 8 (¶ 25). On April 20, 2019, Union Pacific extended Dickson's medical leave until September 2, 2019. Filing 122 at 9 (¶ 28); *see* Filing 108-1 at 93–94 (Exhibit 11).

In July 2019, Dickson's doctors cleared his return to work with no restrictions. Filing 122 at 25 (¶ 62); *e.g.*, Filing 108-1 at 126–31 (Exhibit 19), 132–36 (Exhibit 20). Additionally, Union Pacific proceeded with its fitness-for-duty (FFD) review to determine whether Dickson could safely return to work. Filing 108-1 at 86–87 (Exhibit 9, Medical Comments History); *see* Filing 108-1 at 91 (Exhibit 10). Dr. Matthew Hughes (Dr. Hughes), an Associate Medical Director at Union Pacific, oversaw Dickson's FFD review. Filing 122 at 10 (¶ 31). On July 16, 2019, Dr. Hughes issued an FFD decision for Dickson. Filing 108-1 at 86 (Exhibit 9, Medical Comments History); Filing 122 at 21 (¶ 48). Dr. Hughes made the following assessments:

1. "Cerebral stroke – He may have mild sensory/weakness but his MD states he is mostly improved. He has no cognitive deficit per MD notes. He has had neurospych [sic] testing but results are not know[n]."
2. "[Obstructive sleep apnea] – newly onset diagnosis. He appears to be compliant with CPAP therapy. Action 1-Employee will need restrictions for sudden incapacitation per UPRR medical standards. 2-Will need monitoring for

> [obstructive sleep apnea], next review in 9 months. 3-If covered by FMCSA, will need to have certification pulled."

Filing 108-1 at 86 (cleaned up) (Exhibit 9, Medical Comments History). Additionally, Dr. Hughes issued the following work restrictions:

> 1. Not to operate company vehicles, on-track or mobile equipment, or fork-lifts.
> 2. Not to work on or near moving trains, freight cars or locomotives, unless protected by barriers. (Clarification: This means remaining between the rails or to the field side of the track where there are adjacent tracks with less than 19-foot track centers).
> 3. Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee.
> 4. Not to work at unprotected heights, over 4 feet above the ground. (Clarification: Employee can work on the beds of trucks; and employee can occupy bridges following normal safety practices).
> 5. Not to work on 1-man or 2-man gangs (i.e., switch oiler, inspector, welder or helper job, 2-man section gang). Must have at least two additional employees on gang or at work area to accommodate the provisions of Train Approach Warning regulations (Lookout) or Train Approach Warning provisions may not be used.
> 6. Not to perform work where decisions or actions can affect the safety of others (not to work as a Train Dispatcher or similar safety sensitive positions)
> 7. These restrictions [are] to be placed for a period of 5 years or through April 2024, at which time they can be reevaluated.

Filing 108-1 at 86 (cleaned up) (Exhibit 9, Medical Comments History). These restrictions were communicated to Dickson on July 25, 2019. Filing 108-1 at 120 (Exhibit 16). Additionally, Dr. Hughes testified that he tried to call Dickson on at least two occasions to discuss the FFD decision but was unable to reach him. Filing 108-1 at 102 (Exhibit 13, Hughes Depo. 20:9–21:17).

Dickson alleged that these restrictions prohibited him from returning to work as a front-end loader operator. Filing 22 at 8 (¶¶ 42–43). Accordingly, Dickson has not returned to work for Union Pacific as a front-end loader operator, so his employment at Union Pacific has been terminated. Filing 108-1 at 125 (Exhibit 18) ("[Dickson's] managers stated the restrictions prevented him from performing an essential function, and that this could not be accommodated.

Therefore, [Dickson] has not returned to work at [Union Pacific]."); *see* Filing 22 at 10 (¶¶ 52–54).

On September 25, 2019, Dickson emailed Union Pacific's CEO requesting reconsideration of both the termination of Dickson's employment with Union Pacific and of Union Pacific's FFD decision. Filing 108-1 at 122–23 (Exhibit 17). This communication prompted an internal review of Dickson's FFD review by Dr. John Holland (Dr. Holland), the Chief Medical Officer at Union Pacific. Filing 122 at 22–23 (¶¶ 57–58).

On October 23, 2019, Dr. Holland issued an internal memorandum that "reviewed the relevant medical records" and summarized the following:

> Multiple scientific medical studies provide evidence that a stroke in such a cortical region of the brain poses a substantial risk for future seizures due to the damage to the brain caused by the stroke. This seizure risk is the highest in the first few years after the stroke and . . . then the statistical risk gradually decreases over time (provided the person remains seizure free and is not taking anti-epilepsy drugs). The risk for a future seizure after a stroke exists even if the individual has never had a seizure.
>
> Mr. Dickson's job as a Machine Operator is considered a safety critical position, since if he has a seizure while doing a safety critical activity at work, this may cause an accident [that] endangers him or others. . . . [T]he U.S. Federal Motor Carrier Safety Administration (FMCSA) . . . medical requirements state that a person such as Mr. Dickson who has had a cortical stroke should be restricted from driving commercial vehicles for 5 years after the stroke, due to an increased risk for a future seizure related to the stroke. This FMCSA guidance further states that by 5 years after the stroke the work restrictions may be removed, provided no post-stroke seizure has occurred and a new medical evaluation [shows] no seizure risk factors.
>
> [Union Pacific] has adopted its own medical standards that provide similar guidance on fitness-for-duty after a stroke; these medical standards apply to all safety workers. The rationale for having [Union Pacific's] Medical Standards be similar to FMCSA is that the safety concerns, for worker safety and public safety, are substantially similar for safety critical railroad workers and commercial drivers. For this reason, Mr. Dickson was given work restrictions from doing certain safety critical work activities for 5 years after his stroke (that is, until April 2024). [Union Pacific] considers these work restrictions reasonable to protect the safety of both Mr. Dickson and others.

Filing 108-1 at 124–25 (Exhibit 18) (cleaned up). Dr. Holland also suggest a number of actions including offering formal reconsideration of the FFD decision and work restrictions and assisting Dickson in exploring other vocational options inside or outside Union Pacific. Filing 108-1 at 125 (Exhibit 18).

Also in October 2019, Dickson applied for and began receiving benefits from the United States Railroad Retirement Board because of the stroke in the amount of $3,250 per month. Filing 22 at 10 (¶ 54); Filing 108-1 at 26 (Exhibit 1, Dickson Depo. 127:7–22).

On November 4, 2019, Dr. Holland called Dickson to "explain[] the reasons for his FFD determination and work restrictions." Filing 108-1 at 81 (Exhibit 9, Medical Comments History); Filing 122 at 25 (¶ 59).

### B. Procedural Background

Prior to this suit, Dickson joined a class action suit (*Harris*) against Union Pacific alleging disability discrimination under the ADA. Filing 22 at 2 (¶ 3); *Harris*, 953 F.3d 1030. The class in that case was certified in February 2019 by this Court. *See Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616 (D. Neb. 2019). However, the Eighth Circuit Court of Appeals reversed and decertified the class on March 24, 2020. *Harris*, 953 F.3d 1030. Dickson timely filed a charge of discrimination with the Equal Opportunity Employment Commission (EEOC) on May 1, 2020, and the EEOC issued a right-to-sue letter on August 1, 2023. Filing 22 at 11. Dickson then filed his individual Complaint against Union Pacific on August 2, 2023. Filing 1; Filing 22 at 11.

On December 8, 2023, Dickson filed his First Amended Complaint against Union Pacific "for damages resulting from [Union Pacific's] violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* . . . ." Filing 22 at 1. The Amended Complaint asserted three causes of action under the ADA. Filing 22 at 12–15 (¶¶ 63–82). Count I asserted a claim under 42 U.S.C. § 12112(a), alleging that "Union Pacific discriminated against Dickson on the basis of disability

by, among other things, removing him from service and terminating his employment because of a disability." Filing 22 at 12 (¶ 68). Count II asserted a claim under 42 U.S.C. § 12112(b)(6), alleging that "Union Pacific discriminated against Dickson on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its [FFD] program and related policies, that are intended to screen out individuals with disability, and which did screen out Dickson." Filing 22 at 13 (¶ 73). Count III alleged Disability Discrimination for failure to accommodate under 42 U.S.C. § 12112(b)(5). Filing 22 at 14–15 (¶¶ 77–82).

On December 5, 2025, Union Pacific filed a motion for summary judgment. Filing 69. Prior to Dickson's deadline to respond to Union Pacific's motion for summary judgment, the parties began negotiating a settlement. Filing 77 (text order); *see* Filing 83-2 (parties exchanging emails). These negotiations culminated in a settlement agreement. *See* Filing 78; Filing 80. However, discord arose between the parties and the agreement fell apart. *See* Filing 81; Filing 100.

On June 18, 2026, this Court denied Dickson's Motion to Enforce Settlement Agreement, Filing 81. Filing 100. The Court later extended the dispositive motion deadline and reset pretrial and trial proceedings. Filing 102; Filing 110 (order setting trial).

On July 6, 2026, Union Pacific filed the Renewed Motion for Summary Judgment now before the Court. Filing 103. Union Pacific moved for summary judgment on Counts I and II, the "disparate treatment claims." Filing 104 at 6. Both parties made the appropriate responsive filings. Filing 104; Filing 106; Filing 115; Filing 117; Filing 121; Filing 122 (statement of facts).

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Federal Rule of Civil Procedure 56 provides that a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which

summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law." *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018); Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Kendall v. Zoltek Corp.*, 175 F.4th 1002, 1007 (8th Cir. 2026) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). "The district court may not 'weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue' when determining whether to grant summary judgment." *Reed v. Remington Arms Co., Inc.*, No.25-2886, 2026 WL 3024473 (8th Cir. Oct. 8, 2026) (quoting *Avenoso v. Reliance Std. Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021)).

**B. The Direct Threat Defense is Dispositive**

Union Pacific seeks summary judgment on Counts I and II of Dickson's disability discrimination claims and its own direct threat defense. *See* Fed. R. Civ. P. 56(a) (permitting a party to move for summary judgment on a claim or defense). Thus, the first question the Court must consider is whether analysis of Union Pacific's defense is fully dispositive of the challenged claims making it unnecessary to consider both the claims themselves and the defense.

Union Pacific's filings in support of its Motion for Summary Judgment thoroughly argued that Dickson failed to generate any genuine issues of material fact on his ADA claims, Filing 104 at 6–22, and that the record establishes Union Pacific's direct threat defense as a matter of law, Filing 104 at 22–36. Additionally, Dickson's responsive filings address both issues. *See* Filing 115. The parties' attention to Union Pacific's affirmative defense is appropriate because the Court could grant summary judgment in Union Pacific's favor on that ground even if genuine issues of material fact exist regarding Dickson's disability discrimination claims. *See* *E.E.O.C. v. Wal-Mart*

*Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) ("[S]ummary judgment would still be appropriate under the ADA if [the plaintiff] posed 'a direct threat to the health or safety of other individuals in the workplace.'" (first alteration in original) (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999))); *see also, e.g.*, *Hower v. Union Pac. R.R. Co.*, No. 8:23-CV-206, 2026 WL 1257351, at *13 (D. Neb. Apr. 30, 2026); *Carlton v. Union Pac. R.R. Co.*, No. 8:23-CV-0211, 2026 WL 1020629, at *9 (D. Neb. Apr. 7, 2026). Because the Court concludes that summary judgment in Union Pacific's favor is appropriate in this case on Union Pacific's direct threat defense, the Court will not consider the alternative grounds offered by Union Pacific for summary judgment.

**C. The ADA "Direct Threat" Defense**

To establish an employer's liability on a § 12112(a) or § 12112(b)(6) disparate treatment claim, an ADA plaintiff must prove that "(1) he was 'disabled,' (2) he was 'qualified,' and (3) the employer imposed work limitations because of his disability." *Christensen v. Union Pac. R.R. Co.*, 186 F.4th 587, 593 (8th Cir. 2026) (quoting *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1060 (8th Cir. 2024)). However, an employer can assert a direct threat defense to disparate treatment claims brought under the ADA. *See* *Christensen*, 186 F.4th at 593; 42 U.S.C. §§ 12111(3), 12113(b). If the employer successfully establishes a direct threat defense, the disparate treatment claims—both under § 12112(a) and § 12112(b)(3)—are defeated. *See* *Wal-Mart Stores, Inc.*, 477 F.3d at 571; *Nunes*, 164 F.3d at 1247.

The ADA defines "direct threat" as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). "Direct threat is an affirmative defense for which the employer bears the burden of proof." *Christensen*, 186 F.4th at 593; *Wal-Mart Stores, Inc.*, 477 F.3d at 571 ("Although we have previously declined to resolve which party bears the burden of proving direct threat, we now hold that the employer bears the

burden of proof, as the direct threat defense is an affirmative defense." (citations omitted)). Thus, to obtain summary judgment, the employer must show that the evidence on the question of direct threat is so one-sided no reasonable jury could find for the ADA plaintiff. *See Torgerson*, 643 F.3d at 1042–43, 1052; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

To establish a direct threat defense, an employer must show that the ADA plaintiff posed a "significant risk to the health or safety of others" and that such determination was: "(1) the result of an individualized assessment, (2) objectively reasonable, and (3) based on the 'most current medical knowledge and/or on the best available objective evidence.'" *Sanders*, 108 F.4th at 1062 (quoting 29 C.F.R. § 1630.2(r)). The Eighth Circuit has recognized a number of specific factors outlined in the regulation that courts also should consider, including "(1) the duration of risk, (2) the nature and severity of potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of potential harm." *Wal-Mart Stores, Inc.*, 477 F.3d at 571 (quoting *Nunes*, 164 F.3d at 1248); 29 C.F.R. § 1630.2(r).

**D. Union Pacific Successfully Asserts a Direct Threat Affirmative Defense**

Union Pacific's argument for summary judgment on its direct threat defense adheres to all elements adopted by the Eighth Circuit and consistently applied by this Court. *Sanders*, 108 F.4th at 1062; *Hower*, 2026 WL 1257351, at *14; *Carlton*, 2026 WL 1020629, at *10. Dickson disputes the first and second prongs.[2] Filing 115 at 17–27.

[2] Dickson also does not respond with any counterarguments regarding Union Pacific's 29 C.F.R. § 1630.2(r) analysis. The factors provided by the regulation on the "direct threat" defense include considering "(1) the duration of risk, (2) the nature and severity of potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of potential harm." 29 C.F.R. § 1630.2(r); *Wal-Mart Stores, Inc.*, 477 F.3d at 571 (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999)). These factors assist in considering whether an assessment is individualized. 29 C.F.R. § 1630.2(r). Since the factors are not explicitly contested, the Court will not do a fulsome analysis.

*1. Union Pacific's Assessment Was "Individualized"*

The applicable regulation states in part that "[t]he determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r); *Baldwin v. Union Pac. R.R. Co.*, 147 F.4th 845, 851 (8th Cir. 2025). Thus, the first element of the direct threat defense is that the employer's determination that the employee posed a direct threat was "the result of individualized assessment." *Sanders*, 108 F.4th at 1062 (citing 29 C.F.R. § 1630.2(r)); *accord EEOC v. Drivers Mgmt., LLC*, 142 F.4th 1122, 1133 (8th Cir. 2025). Consistent with the summary judgment standards, the Court must determine whether "the record taken as a whole could . . . lead a rational trier of fact" to find that Union Pacific's decision failed to result from an "individualized assessment" of Dickson's "present ability to safely perform the essential functions of the job," 29 C.F.R. § 1630.2(r). *Kendall*, 175 F.4th at 1007 (quoting *Torgerson*, 643 F.3d at 1042).

a. The Parties' Arguments

Union Pacific argues that its review of Dickson's FFD was "appropriately individualized." Filing 104 at 22, 22–23. Union Pacific points to the Medical Comments History which "document[s] the contacts between Dickson and Union Pacific" throughout the FFD review process. Filing 104 at 22–23; *cf.* Filing 108-1 at 80–90 (Exhibit 9, Medical Comments History). Additionally, Union Pacific argues that it "requested and reviewed all of Dickson's medical records, including imaging of his brain," Filing 104 at 23; Dr. Hughes attempted calls to Dickson, Filing 108-1 at 102 (Exhibit 13, Hughes Depo. 20:9–21:17); and Dr. Holland called Dickson "to explain the restrictions and why Union Pacific was unable to accommodate them," Filing 108-1 at 81 (Exhibit 9, Medical Comments History). Union Pacific argues that these facts demonstrate a sufficiently individualized assessment. *See* Filing 104 at 23. Finally, Union Pacific argues that the

Eighth Circuit's recent holding in *Christensen v. Union Pacific Railroad Co.*, 2026 WL 2320846, supports a finding of individualization on "materially identical facts." Filing 121 at 3.

In response, Dickson counters that reasonable minds could disagree about "whether Union Pacific performed the required individualized analysis." Filing 115 at 20, 19–23. Dickson argues that "[t]he individualized analysis must be specific to the individual employee—not a one-size-fits-all inquiry—and requires the employer to gather substantial information about not only the employee's medical condition" but also "their work history and specific limitations." Filing 115 at 20 (citing *Drivers Mgmt., LLC*, 142 F.4th at 1133; then *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1028 (9th Cir. 2003); and then *Fahey v. Twin City Fan Cos., Ltd.*, 994 F. Supp. 2d 1064, 1074 (D.S.D. 2014)). Dickson further argues that

> Before taking an adverse employment action, the employer must point to "particularized facts" using the best available objective evidence and consider the severity, imminence, and potential likelihood of any potential harm posed by *this* employee in *this* job. Simply reviewing an employee's medical records to identify a medical condition and then imposing standardized work restrictions that are the same for all employees within an entire department regardless of their specific position or condition fails to satisfy this burden as a matter of law.

Filing 115 at 21 (citing *Echazabal*, 336 F.3d at 1027–34; and then *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1308–09 (11th Cir. 2001)). Dickson argues that Union Pacific did not meet these standards and therefore failed to perform an individualized analysis. *See* Filing 121 at 19.

b. No Reasonable Jury Could Find Union Pacific's Assessment of Dickson Failed to Be "Individualized"

The summary judgment record conclusively shows that Union Pacific conducted an individualized assessment. *See Christensen*, 186 F.4th at 593–94. The initial FFD review by Dr. Hughes assessed not only the nature and duration of the specific risks that Dickson faced but also his ability to safely perform his job. *See* Filing 108-1 at 86 (Exhibit 9, Medical Comments History); *Christensen*, 186 F.4th at 594. Specifically, the record shows that Dr. Hughes reviewed

Dickson's medical record which included the Emergency Department records, admission, rehabilitation records, his neurology follow-up, and release documents by his personal doctors. Filing 108-1 at 86–87 (Exhibit 9, Medical Comments History); *see* Filing 108-1 at 91 (Exhibit 10); *see also Christensen*, 186 F.4th at 591, 593. Furthermore, on reconsideration, Dr. Holland again "reviewed the relevant medical records," i.e. Dickson's medical records, and assessed that "a stroke in such a cortical region of the brain poses a substantial risk for future seizures" particularly in the first few years following the stroke. Filing 108-1 at 124 (Exhibit 18); *see Christensen*, 186 F.4th at 591. Additionally, Dr. Holland expressly considered the nature of Dickson's job—which qualified as a "safety critical position"—in affirming the restrictions that unfortunately impair Dickson's ability to engage in "safety critical activity at work." Filing 108-1 at 124 (Exhibit 18); *see, e.g.*, *Christensen*, 186 F.4th at 594.

Dickson does not persuasively argue that Union Pacific was required to do anything more. *See Christensen*, 186 F.4th at 594. Reasonable minds could disagree with the decision rendered by Union Pacific, but reasonable minds cannot disagree that Union Pacific made an individual assessment of Dickson's ability that was based on Dickson's medical record. *See* 29 C.F.R. § 1630.2(r). Dickson does not allege that his medical record was in any way incomplete or that Union Pacific's process fails to collect enough individualized information. *Cf.* Filing 115 at 19–23. Some ADA plaintiffs might present factual scenarios and medical conditions that would necessitate that an employer meet with an employee's treating providers, review medical literature, consult with specialists, and/or consider the employee's recovery progress in order to reach a properly individualized assessment. *See, e.g.*, *Hurd v. Union Pac. R.R. Co.*, 8:23CV201, 2025 WL 713516 (D. Neb. Mar. 4, 2025). That is not the case here.

Dickson suffered from an ischemic stroke. Filing 122 at 6 (¶¶ 18, 22). He was hospitalized and went to a rehabilitation facility for continued numbness and slurred speech. Filing 122 at 8 (¶ 24). Dickson submitted all of the available medical records from his stroke and recovery to Union Pacific in compliance with its FFD procedures. Filing 122 at 10 (¶ 30). At Union Pacific, Dickson held a "safety critical position" as a front-end loader operator. Filing 108-1 at 124 (Exhibit 18). Union Pacific reviewed Dickson's medical record, tried to communicate with Dickson, engaged in thorough reconsideration when he contested the decision by emailing the CEO of Union Pacific, and discussed the decision with Dickson after reconsideration. Filing 108-1 at 121–23 (Exhibit 17); Filing 122 at 10 (¶ 31); Filing 108-1 at 102 (Exhibit 13, Hughes Depo. 20:9–21:17); *see* Filing 108-1 at 124–25 (Exhibit 18). Additionally, the parties do not dispute that Dickson's stroke resulted in a higher risk of future seizures. Filing 108-1 at 124–25 (Exhibit 18). On the undisputed facts, no reasonable jury could find that Union Pacific's assessment was not individualized.

*2. Union Pacific's Assessment Was "Objectively Reasonable" and Based on "Objective Medical Evidence"*

The applicable regulation states in part that the individualized assessment "shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." 29 C.F.R. § 1630.2(r); *Baldwin*, 147 F.4th at 851. To establish the direct threat defense, in addition to an individualized assessment, the employer must show that its determination was "objectively reasonable, and based on the 'most current medical knowledge and/or the best available evidence.'" *Sanders*, 108 F.4th at 1062 (quoting 29 C.F.R. § 1630.2(r)); *Drivers Mgmt., LLC*, 142 F.4th at 1133. Consistent with the summary judgment standards, the Court must determine whether "the record taken as a whole could . . . lead a rational trier of fact" to find either that Union Pacific's decision to restrict Dickson from returning to work was

objectively unreasonable or that Union Pacific failed to "rely on the most current medical knowledge and/or the best available objective evidence," 29 C.F.R. § 1630.2(r). *Kendall*, 175 F.4th at 1007 (quoting *Torgerson*, 643 F.3d at 1042).

a. The Parties' Arguments

Union Pacific argues that its decision to impose workplace restrictions on Dickson was "objectively reasonable" and "relied on objective medical evidence." Filing 104 at 24, 23–28. Union Pacific asserts that it reasonably relied on its doctors' evaluations, Dickson's medical records, and the FMCSA Handbook's guidance in making an objectively reasonable decision to restrict Dickson's return to work in a "safety critical position" as front-end loader operator. Filing 104 at 23–28. Union Pacific argues that its decision appropriately relied on Dr. Hughes's "reasonable medical judgment" of evaluating Dickson's medical records and the guidance provided in the Federal Motor Carrier Safety Administration (FMCSA) Handbook. Filing 104 at 24, 24–25. Additionally, Union Pacific argues that the usage of the FMCSA Handbook has been endorsed by other courts and the National Transportation Safety Board. Filing 104 at 24–28 (arguing that the FMCSA Handbook "provides transparent, objective, evidence-based medical guidance about the durational risks of seizures following a cortical stroke"). Finally, Union Pacific argues that the Eighth Circuit's recent holding in *Christensen* rebuts Dickson's counter arguments. Filing 121 at 5–6.

In response, Dickson counters that reasonable minds could find that Union Pacific failed to base its decision "on the most current medical knowledge or best available evidence."[3] Filing

---

[3] The Court cannot identify differentiated argumentation by Dickson contesting the "objective reasonableness" of Union Pacific's decision as a separate element in a "direct threat" defense. *See* Filing 115 at 23–27. Instead, the Court discerns that the thrust of Dickson's argument contests whether Union Pacific's decision was based on "the most current medical knowledge and best available objective evidence." Filing 115 at 23 (citing *Anderson*, 477 U.S. at 248).

115 at 23, 23–27. Dickson argues that the question of whether the FMCSA Handbook qualifies as "best available evidence" is a triable fact for two reasons. Filing 115 at 24. First, the FMCSA Handbook was withdrawn in 2014 as "obsolete or . . . prescriptive in nature." Filing 115 at 24. Second, even as an unauthoritative source of medical guidance, it is problematic that the FMCSA Handbook was "the sole medical justification to impose work restrictions" on Dickson. Filing 115 at 24. Dickson further argues that Dickson's treating providers, his expert witness, and Union Pacific's own witness came to differing outcomes which therefore called into question Union Pacific's application of the FMCSA Handbook guidance. *See* Filing 115 at 24–26. Overall, Dickson summarizes his argument as follows:

> The Court cannot choose to believe Union Pacific's position and ignore the material dispute Plaintiff's evidence presents. The record contains expert testimony, contrary medical evidence, [and] withdrawn and obsolete guidance . . . . [A] reasonable juror could accept this evidence and conclude "that the company failed to prove that its decision was objectively reasonable and based on the best available objective evidence."

Filing 115 at 26 (citations omitted) (quoting *Sanders*, 108 F.4th at 1062).

b. No Reasonable Jury Could Find Union Pacific's Assessment Was Not "Objectively Reasonable" or Not Based on "Objective Medical Evidence"

This Court concludes that no reasonable jury could find Union Pacific's direct threat determination was objectively unreasonable. *See Christensen*, 186 F.4th at 594–95. Union Pacific relied on the opinions of multiple physicians and a complete medical record in reaching its decisions. *See* Filing 108-1 at 124–25 (Exhibit 18); *Christensen*, 186 F.4th at 593. Additionally, there is nothing in the record to suggest that Union Pacific's decision to restrict Dickson's return to work was "so off-base as to be objectively unreasonable." *Christensen*, 186 F.4th at 595; *see Sanders*, 108 F.4th at 1062 (determining that an employer's decision to limit its employee's return to work was "completely uncalled for, completely wrong, and not based on any medical principals

at all"). Moreover, Dickson even concedes that "[a]t most, Union Pacific identifies evidence a jury could credit." Filing 115 at 23.

The Court also concludes that no reasonable jury could find Union Pacific's "direct threat" determination was not based on the "best available evidence." 29 C.F.R. § 1630.2(r); *see Christensen*, 186 F.4th at 595–96. Union Pacific provided evidence that it consulted the FMCSA guidelines. *See* Filing 108-1 at 125 (Exhibit 18) ("The rationale for having [Union Pacific's] Medical Standards be similar to FMCSA is that the safety concerns, for worker safety and public safety, are substantially similar for safety critical railroad workers and commercial drivers."). Dickson fails to "identify medical literature missing from Union Pacific's consideration" or "claim that Union 'intentional[ly] disregard[ed]' the best objective evidence." *Christensen*, 186 F.4th at 595 (quoting *Carrillo v. Union Pac. R.R. Co.*, case number, 2024 WL 3861374 (5th Cir. Aug. 19, 2024)). Merely pointing to "disagreement among experts" does not "show genuine disputes of material fact exists" in the record. *Christensen*, 186 F.4th at 594–95 (citing *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015); then *Carrillo*, 2024 WL 3861374, at *5; and then *Jackson v. Union Pac. R.R. Co.*, No. 4:19-CV-00069-RGE-RAW, 2021 WL 1726895, at *20 (S.D. Iowa Mar. 29, 2021)). Additionally, Dickson's expert witness's testimony that Union Pacific failed to "consider updated guidance from the FMCSA or Medical Expert Panels, or current peer-reviewed medical literature," Filing 115 at 25, is merely opinion and does not direct a reasonable factfinder to any contradicting "best available evidence." *See Christensen*, 186 F.4th at 595–96.

*3. The Court's Conclusion Is Consistent with Eighth Circuit Precedent*

The Court's conclusion is consistent with the Eighth Circuit's recent decision in *Christensen v. Union Pacific Railroad Co.*, 186 F.4th 587 (8th Cir. 2026). In that case, a conductor of Union Pacific similarly suffered a stroke, underwent an FFD review, and had restrictions

imposed on his return to work by Union Pacific for a period of five years. *Christensen*, 186 F.4th at 591–93. Relevant to this dispute, the Eighth Circuit reasoned the following:

> Here, the summary judgment record establishes each element of Union Pacific's direct threat defense. First, it shows that Union Pacific conducted an individualized assessment. That assessment included multiple rounds of fitness-for-duty evaluations that involved comprehensive review of [the plaintiff's] medical records, his condition, and his job duties. Second, it shows that Union Pacific's decision to restrict [the plaintiff] from returning to work as a conductor was objectively reasonable. Union Pacific relied on the opinions of multiple physicians and on an extensive medical record in reaching its decision. And third, the record shows that Union Pacific acted on the most current medical knowledge and on the best available objective evidence. Again, it is undisputed that [the plaintiff] provided—and Union Pacific reviewed—the appropriate medical records. . . .

*Christensen*, 186 F.4th at 593. The Eighth Circuit affirmed the lower court's grant of summary judgment because "no genuine dispute of material fact exists as to any component of Union Pacific's direct threat defense." *Christensen*, 186 F.4th at 596. The record discussed above shows that Union Pacific engaged in the same thorough consideration described in *Christensen*.

*4. Summary*

The Court concludes that the record establishes Union Pacific's direct threat defense as a matter of law. *See Christensen*, 186 F.4th at 593–96. No reasonable jury could conclude that Dickson can defeat that defense. *See Torgerson*, 643 F.3d at 1042–43, 1052. Accordingly, summary judgment is appropriate pursuant to Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.").

## III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that Union Pacific's Renewed Motion for Summary Judgment, Filing 103, is granted as to Union Pacific's direct threat defense, which defeats Dickson's disparate treatment claims contained in Counts I and II. This case shall proceed only on Count III of Dickson's First Amended Complaint.

Dated this 17th day of November, 2026.

BY THE COURT:

Brian C. Buescher
Chief United States District Judge